## HOWARD GILL *vs.* JOHN BICKNELL.

Two tenants in common of a tract of land, which was divided into lots, having put the same up for sale at public auction, one of them, without any previous knowledge or agreement of the other, bid off and became the purchaser of a lot, by the intervention of an agent, who, in his own name, but declaring that he was acting therein as the agent of such purchaser, signed a memorandum acknowledging to have purchased such lot, and agreeing to comply with the terms of the sale: In a bill in equity, by the other tenant in common, to compel his co-tenant to receive a deed from him of an undivided moiety of the lot so sold, and to pay the plaintiff therefor one half of the price for which the same was bid off, it was held, that there was no contract in writing, or memorandum of such contract, between the parties, upon which a suit in equity to enforce such performance could be maintained.

THIS was a bill in equity, to compel the specific performance of an alleged written contract, for the purchase of land by the defendant at an auction sale.

The plaintiff and defendant, on the 1st of August, 1845, and from thence to the filing of the bill, were the owners in fee simple and tenants in common of a piece of land in Dorchester (on Mount Neponset, so called), comprising thirty-four building lots, which, some time in the spring of 1847, they had agreed and determined to dispose of at public auction.

For this purpose, the parties caused a plan of the lots to be prepared and printed, and copies thereof to be generally distributed. This printed plan was entitled and contained a recital as follows: "Plan of building lots on Mount Neponset to be sold by public auction on Friday, July 2d, at three o'clock P. M.; N. A. Thompson, auctioneer, office, Old State House, Boston." The sale was also advertised in sev-

eral of the leading daily newspapers in Boston, for about a month before the time fixed therefor.

On the day, and at the place and hour appointed for the sale, the parties and several other persons being present, together with the auctioneer and his clerk, the auctioneer cut out of a newspaper a copy of the advertisement of the sale, and prefixed it by wafers to a printed copy of the plan of the lots, and read and exhibited the two as a description of the estate about to be sold. Having made this announcement, and being directed by the defendant, the auctioneer proceeded with the sale.

All the lots, except those numbered from one to seven inclusive, having been disposed of to various purchasers, those lots were put up, and were bid off by William Pierce, as the agent of the defendant, and by his direction, he being present; and without any previous knowledge or suspicion, on the part of the plaintiff, that the defendant intended to bid, or had employed any person to bid for him, at such sale. At the time of his bid for the lots, Pierce stated that he was acting as the agent of the defendant, and he was accordingly declared the highest bidder, and the purchaser thereof, as such agent.

When the biddings were concluded, the auctioneer annexed a piece of writing paper by wafers to the bottom of the printed plan, to which he had previously attached one of the printed advertisements, as above stated, and wrote on the paper as follows: "Neponset, July 2d, 1847. We, the undersigned, hereby acknowledge to have this day purchased by public auction, of Newell A. Thompson, auctioneer, the several lots of land mentioned in the above printed advertisement, and plan annexed, and set against our respective names, and we severally agree to comply with the terms of the sale." This paper was first signed by Pierce, in his own name, but acting as the agent of the defendant, in his presence and with his approval, and then by all the other purchasers. Pierce declared that the title, under this agreement, was to go from the plaintiff, of his one undivided half of the lots purchased

by Pierce, to the defendant, and directed a deed thereof to be made accordingly; and that the plaintiff, or the auctioneer, should call on the defendant, and deliver him the plaintiff's deed of an undivided half of the lots, and receive of the defendant one half of the sum for which the same were bid off.

Deeds of all the lots sold, except those bid off by Pierce, were prepared and executed by the plaintiff, and were tendered to the defendant, to be executed by him, but he refused to execute the same, or in any manner to perform his engagement to the purchasers. The plaintiff also executed a deed of his undivided half of the lots, bid off by Pierce, to the defendant, as grantee, and tendered the same to him, on the condition that the defendant should pay or secure him for one half the price for which the lots were thus bid off; but the defendant refused to receive the deed, and to pay the purchase money, and declined altogether to perform the agreement entered into by Pierce for him.

The plaintiff averred, in his bill, that he was ready, and at all reasonable times would thereafter continue to be ready, to perform the agreement on his part, both to the other purchasers, and to the defendant; and, for want of a plain, adequate, and complete remedy, at the common law, he prayed the court to decree against the defendant a specific performance of the written contract entered into by him for the purchase of the lots, as above mentioned.

The defendant demurred to the bill, on the ground, that it did not set forth any contract or agreement, which was binding on him, and because the plaintiff, if entitled to any relief, had a plain, adequate, and complete remedy at the common law.

*J. J. Clarke*, for the defendant.

*E. Ames* and *N. F. Safford*, for the plaintiff.

SHAW, C. J. This is a bill in equity by the vendor of land, against the vendee, for the specific performance of a contract alleged to have been made by the defendant, to accept a deed and pay for land bid off at auction. To maintain this suit in equity, the plaintiff, in order to bring his case within the

equity jurisdiction of this court, must prove a written con-tract, of which he seeks the performance. Rev. Sts. *c.* 81, § 6, clause 3. So, because it is a contract for the sale of lands, no action will lie, unless the contract, promise, or agreement, or some memorandum or note thereof, is in writ-ing, signed by the party to be charged therewith, or by some person by him authorized. Rev. Sts. *c.* 74, § 1, clause 4. There is a general demurrer to the bill.

It would be very questionable, if that alone were the ground of demurrer, whether, upon the plaintiff's own show-ing, he has not an adequate and complete remedy at law. It is no injury to him, if the defendant, on tender of the deed, declined taking it ; if the deed was well tendered, and the defendant was liable at all, he became bound to pay the money, whether he received the deed or not, and the plain-tiff's only ground of complaint is, that the defendant did not pay the money ; and there seems no good reason, why an action at law for the money would not afford the plaintiff all the remedy he can ask.

It is now well settled, by authorities, that a sale of real estate at auction, where the name of the bidder is entered by the auctioneer, or by his clerk, under his direction, on the spot, and such entry is so connected with the subject and terms of sale, as to make a part of the memorandum, is a contract in writing, so as to take the case out of the statute of frauds. The true reason probably is, that a sale at auc-tion, being open and visible and in presence of witnesses, either competitors, or persons present and closely watching the proceeding, there is less danger of fraud and perjury, in prov-ing the making and terms of the contract, and so the main reason for requiring a memorandum in writing does not ex-ist. The technical ground is, that the purchaser, by the very act of bidding, connected with the usage and practice of auc-tion sales, loudly and notoriously calls on the auctioneer or his clerk to put down his name as the bidder, and thus con-fers an authority on the auctioneer or clerk, to sign his name, and this is the whole extent of the authority. *Emmerson* v.

*Heelis,* 2 Taunt. 38; *White* v. *Proctor,* 4 Taunt. 209; *Kemyss* v. *Proctor,* 3 Ves. & B. 57; *Cleaves* v. *Foss,* 4 Greenl. R. 1.

But this presupposes, that the name is thus written on a book or memorandum prepared, under a caption stating the subject matter and terms of the sale; or on the catalogue, advertisement, or written or printed conditions of sale; or so definitely referring thereto, as to make the paper referred to a part of the memorandum. The bid is in the nature of an affirmative answer; and it is necessary to consider the proposal, in order to understand the effect of the answer. Both together may constitute a contract, or the memorandum of a contract, from which its substance and terms may be gathered. In a recent case, in this court, it was held, that the putting down the name of a bidder was not a sufficient memorandum in writing, because it was not under such a caption, and did not so definitely refer to any catalogue, advertisement, written or printed, or conditions of sale, as to make them part of the memorandum. *Morton* v. *Dean,* 13 Met. 385. Commonly, the advertisement expresses the property to be sold, and if not the names of the owners, the actual owners, represented by the auctioneer, together with the time and other terms of payment; so that when the name of the bidder, and the price, are added, the whole constitutes the clements and substance of a complete contract. But, it may be asked, a contract between whom? Obviously, the owner or owners on the one side, and the purchaser or purchasers on the other. *Prima facie,* therefore, the auctioneer's memorandum, or a memorandum by the bidder, in his own name, constitutes such a contract.

Then what is the case of the plaintiff? He alleges that he and the defendant were tenants in common of the lots offered at auction. He does not state in the bill, that they were owners in equal shares; and such ownership is only intimated by the allegation, that the defendant refused to take a deed of an undivided moiety, and to pay a half of the price, at which it was bid off.

Whether one of two tenants in common may bid at such a sale, in competition with strangers, and without notice to that effect given to bidders, is doubtful; but in the case of a single owner, the bidding through a third person, without notice, would be fraudulent.   Where there are several owners, as, for instance, the members of a joint stock land company, if it were distinctly stated, among the terms of sale, that each member might bid on his own individual account, it being understood to be *bona fide,* and, as between himself and his co-tenants, an actual purchase, on his several account, to be taken and paid for by him, as by other bidders, such notice would probably avoid all imputation of deception, and the sale be therefore valid.

But suppose the transaction not obnoxious to this objection; the plaintiff seeks to enforce a contract very special in its nature, and entirely different from that embraced in the written memorandum.   Instead of a contract by the two owners with the bidder, it is a contract by the two owners with one of themselves; instead of a contract to pay an entire sum for a deed of an entire lot from two, it is a contract by one of the two owners, to pay one half the sum bid, for a deed from a co-tenant, of an undivided moiety of the lot.   We do not mean to be understood as saying, that such a contract could not be made, and enforced both in law and equity; but it would be a very different contract from that created by the bidding at auction, connected with the advertisement and other conditions of sale; and in the present case, must be made out by evidence *aliunde,* and to a great extent by parol evidence.   Instead of there being any previous agreement, in writing, or otherwise, that if either of the owners should bid, he should take the lot bid off by him, on paying one half the price bid, and should take a deed of an undivided moiety of the land thus purchased, the plaintiff alleges, that he did not know of the defendant's intention to bid, or that Pierce's bid was for him, until after the sale.

The court are of opinion, that there was no contract in writing between these parties, for the sale and purchase of the

land in question, or any memorandum of such a contract, and therefore that this suit in equity to enforce a specific performance cannot be maintained.

*Judgment for the defendant.*